## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

ANGEL OLIVERA,
  Plaintiff,

v.

Civil No. 03-2195 (HL)

BRISTOL LABORATORIES D/B/A
BRISTOL MYERS SQUIBB
MANUFACTURING COMPANY,
  Defendant.

## OPINION AND ORDER

Plaintiff Angel Olivera brings this action under the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against his former employer Bristol Laboratories, d/b/a Bristol Myers Squibb Manufacturing Company (hereinafter "Bristol Myers Squibb" or "BMS"), to recover long-term disability ("LTD") benefits under a BMS employee benefit plan.[1]  Pending before the Court is Defendant's motion for summary judgment.[2]  Plaintiff filed an opposition[3] to said motion and Defendant filed a reply[4] to Plaintiff's opposition.

For the reason set forth below, Defendant's motion for summary judgment is **granted**.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant a

---

[1] The complaint originally included additional claims and parties, but Plaintiffs moved for voluntary dismissal of all but Olivera's ERISA claim. *See* Dkt. Nos. 12 & 14.

[2] *See* Dkt. Nos. 30, 31.

[3] *See* Dkt. Nos. 43, 44.

[4] *See* Dkt. Nos. 54, 55.

motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining if a material fact is "genuine" the Court does not weigh the facts but, instead, ascertains whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir.1995).

Once a party moves for summary judgment, it bears the initial burden. Specifically, "'a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. *See* Fed.R.Civ.P. 56(e); *Libertad v. Welch*, 53 F.3d 428, 435 (1st Cir.1995). Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Furthermore, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To aid the Court in the task of identifying genuine issues of material fact in the record, the District for Puerto Rico has adopted Local Rule 56 (formerly Local Rule 311.12). D.P.R. L.Civ.R 56(b)-(c). Local Rule 56(b) requires that a party moving for summary judgment submit, in support of the motion, "a separate, short, and concise statement of material facts as to which the moving party contends there is  no genuine issue

to be tried and the basis of such contention as to each  material fact, properly supported by specific reference to the record." *Id.; see also Leary,* 58 F.3d at 751.  Further, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation . . ." D.P.R. L.Civ.R 56(c).  "Where the party opposing summary judgment fails to comply, the rule permits the district court to treat the moving party's statement of facts as uncontested." *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 80 (1st Cir.2005). The Court will only consider the facts alleged in the parties' Local Rule 56 statements when entertaining the movant's arguments. *Rivera v. Telefonica de Puerto Rico*, 913 F.Supp. 81, 85 (D.P.R. 1995).

## FACTUAL BACKGROUND[5]

### The Plan

Defendant Bristol Myers Squibb maintains a long-term disability ("LTD") benefit plan for its employees.[6]  The parties both submit that this Plan is subject to the provisions of ERISA, 29 U.S.C. § 1001, *et seq.* The plain language of the Plan provides that the plan administrator has the discretionary authority and responsibility to grant or deny participants' claims for benefits under the Plan.[7]  Medical Card Services ("MCS") and/or CORE, Inc. were the plan administrators under the Plan at the time Olivera's petitions for benefits were made.

To be eligible for long-term disability benefits under the Plan a participant must

---

[5]  Plaintiff did not submit an opposing statement of material facts that complied with Local Rule 56(c).  D.P.R. L.Civ.R. 56(c).  Thus, the facts contained in Defendant's supporting statement of material facts, where supported by sufficient record citation, are deemed admitted. *See* D.P.R. L.Civ.R. 56(e).

[6] *See* BMS Long-term Disability Plan, Dkt. No. 30-4; BMS Summary Plan Description*,* Dkt. No. 30-5.

[7] *See* Dkt. No. 30-4, at p.33-35 .

satisfy the definition of "total disability" set forth in the Plan. For the first year of a participant's disability, the definition of "total disability" under the Plan is defined as  the inability "to perform the essential functions of one's *own* occupation or any other job that the Company offers him, other than a Temporary Alternative Work Duty assignment" as a result of any injury or illness including a nervous, psychoneurotic, mental or personality disorder.[8]  For subsequent years of a participant's disability, "total disability" under the Plan is defined as the inability "to engage in *any* occupation for which the person is qualified by education, training or experience."[9]  The Plan further sets forth that payment of benefits under the Plan are conditioned on a participant's total disability resulting from bodily injury, illness or sickness, and will cease on the date the participant ceases to be "totally disabled."

### Olivera's Application for Short-term Disability Benefits

Plaintiff Olivera worked for Defendant BMS as a warehouse manager performing office work.  Due to a lumbar condition, Olivera stopped working and applied for disability benefits from BMS in April of 2000.  Thereafter, Olivera began receiving short-term disability ("STD") benefits from BMS.  On June 27, 2000, as part of its evaluation of eligibility for STD benefits, BMS's delegated plan administrator, Medical Card Systems ("MCS"), requested that Plaintiff submit a copy of his medical file from his treating physician, Dr. Samuel Méndez. Subsequently, Plaintiff's record was referred to an independent medical consultant, Dr. José Ocasio for a medical evaluation. Dr. Ocasio concluded that Olivera could do sedentary work and suggested that Olivera undergo a functional capacity evaluation.[10] On August 3, 2000, Olivera underwent a functional capacity evaluation at the Functional Capacity Evaluation Center, Inc ("FCEC") in San Juan, Puerto Rico. Javier Espina, the Director of the FCEC, informed MCS that Olivera was unable to work at that time as a warehouse manager according to the job description

---

[8] Dkt. No. 30-4, at p.11 ¶ 1.17 (emphasis added).

[9] *Id.* (emphasis added).

[10] *See* Dkt. No. 33, Ex. 3A at Bates-stamp no. 282.

that had been provided to the FCEC.[11] On August 8, 2000, Dr. Ocasio reviewed the functional capacity evaluation and other medical evidence submitted to him and recommended the approval of Olivera's short-term disability benefits.[12]

### Olivera's Application for Long-Term Disability Benefits

On October 19, 2000, Olivera's record was referred to Dr. Ocasio in order to determine Olivera's eligibility for long-term disability (LTD) benefits under the Plan's first definition of "total disability."[13]   On October 27, 2000, Dr. Ocasio reviewed the record and recommended that Olivera's initial LTD benefits be approved.[14] Accordingly, On October 31, 2000, MCS informed Olivera that his LTD benefits had been approved.  In early March of 2001, MCS requested that Olivera submit medical files and attend a functional capacity evaluation which would be performed later that month. On March 20, 2001, the functional capacity evaluation was performed. Javier Espina of the FCEC provided MCS with a report concluding that Olivera was not able to work at that time.[15] Olivera's record was again referred to Dr. Ocasio for his review. On March 27, 2001, Dr. Ocasio recommended the continuance of Olivera's LTD benefits under the Plan's first definition of total disability.[16]

On August 20, 2001, MCS requested that Olivera submit his updated medical files. These files contained a note dated May 4, 2001 by Dr. Samuel Méndez, Olivera's treating physician, stating that Olivera has a permanent and incapacitating neurological condition, and that he has ordered Olivera to not sit, stand, or walk for more than twenty minutes at a time.[17]  The record also included a brief note dated May 7, 2001 by Dr. Ivan Martínez

---

[11] *See id.*, at Bates-stamp nos. 239-240.

[12] *See id.*, at Bates-stamp no. 281.

[13] *See id.*, at Bates-stamp no. 232.

[14] *See id.*

[15] *See id.* at Bates-stamp nos. 349-379.

[16] *See id.* at Bates-stamp no. 281.

[17] *See id.,* at Bates-stamp no. 388.

stating that Olivera suffers from Hernial Nucleus Pulpous L4-L5, bulging disc, and right tennis elbow, and that Olivera can only lift, push pull or carry objects of ten (10) pounds or less for two (2) to three (3) minutes and can only be in a sitting position for twenty (20) minutes every two (2) to three (3) hours.[18] Dr. Martínez's letter further stated that Olivera is better standing for two (2) to three (3) hours or staying in bed for eight (8) to ten (10) hours.[19]

A whole body functional capacity evaluation was performed on Olivera on August 30, 2001. In a letter dated September 13, 2001, summarizing the results of the functional capacity evaluation, Dr. Rafael Sein stated that Olivera had a work capacity level for light duty with restrictions on weight-bending activities and that Olivera could return to work at his previous occupation.[20] Specifically, the results indicated that although Olivera arrived to the evaluation using a cane, he was able to perform balance and carrying activities without demonstrating the need for use of a cane.[21]  Further, Dr. Sein recommended that Olivera had a workday tolerance of eight (8) hours and could sit for fifty (50) minute durations and stand for thirty (30) minute durations without interruption.[22] On September 17, 2001, Olivera's medical record was referred to Dr. Ocasio who concluded that Olivera was not totally disabled and recommended that his application for LTD benefits be denied.[23] Accordingly on September 20, 2001, MCS informed Olivera that his benefits would be terminated as of September 30, 2001, because it had been determined that he was

---

[18]  *See id.,* at Bates-stamp no. 389.

[19]  *See id.*

[20]  *See id.*, at Bates-stamp no. 331.

[21]  *See id.*

[22]  *See id.*, at Bates-stamp no. 331.

[23]  *See id.*, at Bates-stamp no. 420.

not totally disabled under the first definition of the Plan.[24]

Through a letter dated October 8, 2001, Olivera appealed the decision to terminate his LTD benefits.[25] The appeal included progress notes from Dr. Juan M. Padilla;  progress notes from Physiatrist Dr. Ivan Martínez dated June 21, 2000;[26] progress notes from the years 1999-2000 and a medical certificate from Dr. Samuel Méndez;[27] a Social Security determination;[28] and a functional capacity examination report dated May 28, 2001.[29]  The appeal record was referred to Dr. Ocasio for review. On October 23, 2001, Dr. Ocasio noted that most of the evidence presented in the appeal was already on record and had been collected prior to the September 2001 functional capacity evaluation which had ultimately revealed that Olivera may perform his own occupation.[30] Accordingly, Dr. Ocasio recommended that Olivera's appeal of the termination of LTD benefits be denied.[31] On October 25, 2001, MCS informed Olivera that his appeal had been denied and that the termination of his LTD had been upheld because he did not meet the first definition of disability under the Plan.[32] Additionally, Olivera was informed of his right to seek a second appeal and the procedure to do so.

In a letter dated November 20, 2001, MSC received through Olivera's attorney, a second appeal regarding the termination of LTD benefits and an appeal letter drafted by

---

[24]  *See id.*, at Bates-stamp no. 319, Official translation, Dkt. No. 42.

[25]  *See id.*, at Bates-stamp no. 424.

[26]  *See id.*, at Bates-stamp no. 221.

[27]  *See id.*, at Bates-stamp nos. 409-416, 422.

[28] *See id.*, at Bates-stamp nos. 540-550.

[29]  *See id.*, at Bates-stamp nos. 390-391.

[30]  *See id.*, at Bates-stamp no. 439.

[31]  *See id.*

[32]  *See id.*, at Bates-stamp no. 310, Official translation, Dkt. No. 42.

Case 3:03-cv-02195-HL   Document 72   Filed 04/05/06   Page 8 of 20

8

Olivera himself.[33] Olivera's letter included a chronological list of events concerning his health condition, and related diagnosis and treatment. With his appeal, Olivera included progress notes and a report by Neurologist Dr. Melba Sotomayor; a medical certificate, progress notes, and report by Neurologist Dr. Samuel Mendez; progress notes and a report by Physiatrist Dr. Ivan Martínez; progress notes by Neurosurgeon Dr. Juan Padilla; files from the Social Security Administration; MRI results of May 4, 1999 and April 13, 2000; roentgenological consultation results; bone scan results; and nerve conduction and electromyography results.

CORE, Inc. the claims administrator and advisor of the BMS Plan informed Olivera through a letter dated April 24, 2002, that the Appeal Committe had approved his appeal.[34] Specifically, the Committee had concluded that, subject to the first definition of total disability under the Plan, Olivera was totally disabled effective September 20, 2001.[35] Accordingly, on April 30, 2002, MCS informed Olivera that his LTD benefits were to be reinstated retroactively as of October 1, 2001.

On May 8, 2002, as part of an evaluation of continued eligibility for LTD benefits, MCS requested that Olivera submit medical files and progress notes from November 2001 through May 2002. On May 16, 2002, Olivera submitted progress notes from Dr. Ivan Martínez[36] and Samuel Méndez.[37] The record was subsequently referred to Dr. Ocasio for review under the Plan's second definition of total disability.[38]  Upon evaluating Olivera's

---

[33]  *See id.*, at Bates-stamp nos. 441, 459-463.

[34]  *See id.*, at Bates-stamp nos. 487-488.

[35]  *See id.*

[36]  *See id.*, at Bates-stamp nos. 497-498.

[37]  *See id.*, at Bates-stamp nos. 491-495.

[38]  As discussed above, for the second or subsequent years of a participant's disability, "total disability" under the Plan is defined as the inability to engage in any occupation for which the person is qualified by education, training or experience. *See* Dkt. No. 30-4, at p.11 ¶ 1.17

medical record, Dr. Ocasio noted that Olivera was symptomatic and on a conservative treatment program, but that the evidence did not sustain a total disability.[39] Dr. Ocasio requested evidence of an MRI which from the medical records appeared to have been previously ordered by Olivera's treating physician. On May 23, 2002, MCS requested that Olivera submit evidence of physical therapies and results of the MRI previously recommended by Dr. Martínez. MCS received the evidence of the physical therapies on June 3, 2002. However, Olivera informed MCS that the MRI authorization orders had not been issued. On June 7, 2002, Dr. Ocasio reviewed Olivera's medical record. Dr. Ocasio commented that although Olivera's benefits had been reinstated by the BMS Committe he did not see enough evidence of a total disability.[40] Dr. Ocasio recommended approval and follow-up in six months.[41] On June 24, 2002, Olivera submitted reports of the MRI of the lumbar spine and a whole body scan.[42] Dr. Ocasio reviewed Olivera's updated medical records and concluded that he still did not find enough evidence to find a total disability.[43] Although he questioned the reinstatement of benefits by BMS, Dr. Ocasio recommended that Olivera's LTD benefits remain approved until December of 2002.[44]

On July 17, 2002, MCS requested that Olivera attend a whole body functional capacity evaluation with Physiatrist Dr. Rafael Sein.  The whole body functional capacity examination was held on August 1, 2002. In a letter dated August 26, 2002, accompanying the functional capacity assessment, Dr. Sein found that – upon analyzing the results from the evaluation– Olivera has a functional physical capacity for light duty activities with

---

[39]  *See* Dkt. No. 33, Ex. 3A at Bates-stamp no. 499.

[40]  *See id.,* at Bates-stamp no. 502.

[41]  *See id.*

[42]  *See id.,* at Bates-stamp nos. 503-505.

[43]  *See id.,* at Bates-stamp no. 507.

[44]  *See id.*

10

restrictions on weight-lifting activities.[45] Dr. Sein reported that the assessment results constituted a sub-maximal representation of Olivera's physical capabilities due to multiple inconsistences during the examination and his finding that the medical record provided did not justify Olivera's restricted performance on the functional capacity examination.[46] Dr. Sein concluded that Olivera could do more than what he demonstrated during the examination. The functional capacity examination results state that during an eight (8) hour workday Olivera could sit for four (4) hours, stand for two (2) to three (3) hours, and walk for four (4) hours.[47] The results further stated that Olivera could sit for a forty (40) minute duration, stand for twenty (20) to thirty (30) minute durations, and occasionally walk short distances.[48]

The results of the August 2002 functional capacity examination were referred to Dr. Ocasio. On that same date, Dr. Ocasio, upon review of the new documentation, concluded that Olivera is ill and needs treatment but is not totally disabled. Dr. Ocasio recommended the termination of Olivera's LTD benefits.[49] In a letter dated September 6, 2002, MCS informed Olivera of its determination that he is not totally disabled according to the second definition of the BMS LTD Plan. The letter further stated that Olivera's benefits would be terminated on September 15, 2002. On October 18, 2002, Olivera, through his attorney, appealed the denial of his LTD benefits. The documentation submitted in support of his appeal included an October 7, 2002 report prepared by Dr. Ivan Martínez[50] and an October 8, 2002 letter from Dr. Samuel Mendez. Dr. Martínez, in his report, states that Olivera has

---

[45]  *See id.,* at Bates-stamp nos. 467-468.

[46]  *See id.*

[47]  *See id.,* at Bates-stamp no. 469.

[48]  *See id.*

[49]  *See id.,* at Bates-stamp no. 510.

[50]  *See* Dkt. No. 43-19.

a severe disability due to chronic low back pain caused by degenerative joint disease on his lumbosacral spine and protusion disc L4-L5. Specifically, Dr. Martínez's diagnostic impressions were that Olivera has: cervical strain, lumbosacral strain, protrusion L4-L5, degenerative joint disease lumbosacral, bilateral medical epicondylitis, bilateral lateral epicondylitis, bilateral shoulder tendinitis, bilateral shoulder sprain, left C5 root lesion, left S1 root lesion, neurogenic claudication, depression, degenerative joint disease.  Dr. Martínez concluded that Olivera is permanently and totally disabled.

On February 21, 2003, Olivera's file was referred to Dr. Leonel Shub, for a third-party review of Olivera's LTD benefits denial. On May 5, 2003, Olivera underwent an independent medical evaluation with Dr. Shub. Dr. Shub reviewed Olivera's medical file, including records from Dr. Frontera, Grupo Neurologico del Oeste, Dr. Melba Sotomayor,[51] Mayaguez Nuclear Medicine, Dr. Remi Rodriguez Tomas (radiologist), Dr. Jorge Carreras, Dr. Sein (functional capacity evaluation), Fuctional Capacity and Wellness Center, Centro Nuclear San Cristobal, Dr. Padilla (neurosurgeon), and Dr. Ivan Martínez. Dr. Shub concluded that Olivera's medical diagnosis was discogenic disease L4-L5, L5-S1, mechanical low back pain, central disc herniation C4-C5 without root or spinal cord compression, central disc bulge L4-L5, L5-S1 disc desiccation, and left L5-S1 root disease.[52]  Dr. Shub's opinion was that based upon Olivera's history, physical examination and record reviews, there were inconsistencies in the case that warranted further

---

[51] In a report by one of Olivera's treating physicians, Dr. Melba Sotomayor, dated November 26, 2001, Dr. Sotomayor concluded that Olivera has the following conditions: lumbar radiculopathy secondary to HNP, lumbar spine degenerative disease, neurogenic claudication, recurrent elbow epicondylitis, right shoulder tendinitis, and depression. Dr. Sotomayor conlcuded that Olivera is totally disabled from any gainful work because: his pain disturbs his sleep, attention, and negatively affects his tolerance to stressful situations; he is a poor candidate for rehabilitation program because of his attention deficit, continuous pain, intolerance for sitting and standing; he has a neurogenic claudication that limits his ability for walking, causes sexual problems, aggravates his depression and low self esteem; his condition is worsening, and he previously worked in a high attention and physically demanding position.  *See* Dkt. No. 43-10.

[52] *See id.,* at Bates-stamp no. 536.

investigation.[53]  Dr. Shub further stated in his report that Olivera's stated disabilities do not correspond with objective medical findings; specifically Olivera's MRIs, bone scans, CT scans, electro-diagnostic tests, and radiologic findings are inconsistent with Olivera's stated disabilities.[54] Dr. Shub also found that Olivera's normal shoe wear and tear patterns, lack of hand calluses, the pristine condition of his crutches, lack of significant muscle atrophy, symmetric reflexes, and abnormal distribution of pain and loss of sensation in a stocking glove distribution were inconsistent with Olivera's stated disabilities.[55] Dr. Shub also pointed out that several medical records state normal motor strength and negative straight leg rasing tests, normal deep tendon reflexes and normal motor strength, and normal neurologic examination results.[56]  In a letter dated June 26, 2003, Olivera was informed that the BMS LTD Appeal Committee had decided to deny Olivera's final appeal for LTD benefits on the grounds that the evidence indicates that Olivera is not totally disabled under the Plan's second definition of total disability, (§ 1.17(b) of the Plan).

Plaintiff filed the instant complaint on November 5, 2003, seeking reinstatement of benefits under the BMS LTD Plan pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

### DISCUSSION

ERISA governs the rights and responsibilities of parties in relation to employee pension and welfare benefit plans. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650-651 (1995).  ERISA establishes a cause of action for plan participants and other beneficiaries, "to recover benefits due to him [or her] under the terms of his [or her] right to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

---

[53]  *See id.,* at Bates-stamp nos. 533-537.

[54]  *See id.,* at Bates-stamp nos. 536-537.

[55]  *See id.,* at Bates-stamp nos. 536-537.

[56] *See id.,* at Bates-stamp no. 536.

13

ERISA does not establish a standard of review which courts should apply when considering benefits claims under 29 U.S.C. § 1132(a)(1)(B).  However, the United States Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of plan," in which case an arbitrary and capricious or abuse of discretion standard is to be employed. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Madera v. Marsh USA, Inc.*, 426 F.3d 56, 63 (1st Cir.2005)(quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115)); *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 516 n.7 (1st Cir.2005); *Terry v. Bayer Corp.,* 145 F.3d 28, 37 (1st Cir.1998); *Recupero v. New England Telephone & Telegraph Co.,* 118 F.3d 820, 827 (1st Cir.1997) (holding that where the clear discretionary grant is found, "*Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review."); *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993).

The record in this case demonstrates that Bristol Meyers Squibb's LTD Plan grants discretionary authority to the plan administrator, (Medical Card Services ("MCS") or CORE, Inc.), to make the necessary decisions concerning claimant eligibility. The Plan provides that the plan administrator "with the following discretionary authority and responsibilities in addition to those provided elsewhere are:

> (a) to grant or deny Participants' claims for benefits under the Plan;
> (b) to require any person to furnish such information as he may request for the purpose of the proper administration of the Plan as a condition to receiving any benefit under the Plan;
> (c) to make and enforce such rules and regulations and prescribe the uses of such forms as he deems necessary for the efficient administration of the Plan;
> . . .
> (e) to determine the amount of benefits which shall be payable to a Participant in accordance with the provisions of the Plan and to authorize payment of such benefits;
>  . . .
> (h) to interpret and construe the provision of the Plan and to resolve ambiguities, inconsistencies and omissions therein;
> . . .
> (j) to delegate any of his responsibilities to other persons designated by him as he may see fit, including, but not limited to the determination of questions concerning the eligibility of any employee to participate in or receive benefits

14

under the Plan; the interpretation and construction of the provision of the
Plan."
(Dkt. 30-4, at p.33-35).

The Court of Appeals for the First Circuit in *Rodriguez-Abreu* counsels that the
grant of discretionary authority must be clear. *Rodriguez-Abreu,* 986 F.2d at 583.  Upon
reviewing the language of the employee benefit plan at issue, the Court finds that the Plan
clearly grants the plan administrator broad discretion to find necessary facts, determine
eligibility for benefits, and interpret the terms of the Plan. As such, the benefit eligibility
decisions made by the Bristol Meyers Squibb LTD plan administrator is properly examined
under "'a deferential arbitrary and capricious [or abuse of discretion][57] standard of judicial
review.'" *Madera*, 426 F.3d at 64 (quoting *Brigham v. Sun Life of Canada*, 317 F.3d 72, 81
(1st Cir.2003))(citing *Terry*, 145 F.3d at 37); *see also Gannon v. Metro. Life Ins. Co.*, 360
F.3d 211, 212-213 (1st Cir.2004). "Under the 'arbitrary and capricious' framework, as
applied to ERISA review, a decision will be upheld 'if it is reasoned and supported by
substantial evidence.'" *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 27 (1st
Cir.2005)(quoting *Gannon*, 360 F.3d at 213); *see also Glista v. Unum Life Ins. Co. of Am.*,
378 F.3d 113, 126 (1st Cir.2004).

Defendant moves for summary judgment on the grounds that there is no dispute as
to any material fact and it is entitled to judgment as a matter of law because the final
decision to deny Olivera's LTD benefits on the grounds that he was not totally disabled
was made in strict compliance with the BMS LTD Plan, was not arbitrary or capricious,
and was based upon substantial evidence on the record. Plaintiff objects to Defendant's
motion for summary judgment for the following two reasons: (1) there is a conflict of
interest and thus, the Court should review the action under a less deferential standard of
review and (2) the decision to deny Olivera's benefits was based on insufficient evidence
and ignored evidence that supported his application.

If a plan administrator or fiduciary is operating under a conflict of interest, "the

---

[57] "'[T]he arbitrary and capricious standard is functionally equivalent to the abuse of discretion
standard.'" *Buffonge*, 426 F.3d at 28 n. 11 (quoting *Wright v. R.R. Donnelley & Sons Co. Group
Benefits Plan*, 402 F.3d 67, 74 n. 3 (1st Cir.2005)).

15

conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co.*, 489 U.S. at 103, 115. "In this Circuit, if a court concludes there is an improper motivation amounting to a conflict of interest the court 'may cede a diminished degree of deference –or no deference at all– to the administrator's determinations.'" *Wright v. R.R. Donnelley & Sons Co. Group Benefits*, 402 F.3d 67, 74 (1st Cir.2005) (quoting *Leahy v. Raytheon*, 315 F.3d 11, 16 (1st Cir.2002)). "However 'a conflict of interest must be real. A chimerical, imagined or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due.'" *Id.* (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11,16 (1st Cir.2002)). On summary judgment, the burden is on the claimant to show that the benefits decision was improperly motivated. *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir.1998) (finding that simply pointing out that any award of benefits would come out of the plan administrator's own pocket was not sufficient to satisfy a claimant's burden and thus, the traditional arbitrary and capricious standard of review must be applied.)

In the present case, Plaintiff argues that a conflict of interest exists because although the original decision to grant or deny Olivera's LTD benefits was made by an independent entity, MCS or CORE, Inc., the final decision rested with the employer or its subordinates. Plaintiff concludes that therefore, a formal conflict of interests exists because the entity that made the ultimate benefits decision, is also the party that must pay for any benefits awarded under the Plan. The Court rejects this argument. "Under the law of this Circuit, the fact that [a fiduciary or ] the plan administrator will have to pay the plaintiff's claim out of its own assets does not change the arbitrary and capricious standard of review." *Wright*, 402 F.3d at 75 (quoting *Glista*, 378 F.3d at 125-26)(noting that simply because a plan administrator has to pay a claim does not deprive the administrator of discretion when the terms of the plan grant discretion)(internal quotation alterations omitted); *see also Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999); *Doyle*, 144 F.3d at 184. Plaintiff has failed to meet his burden to show that his benefits decision was improperly motivated. *See Doyle*, 144 F.3d at 184. Accordingly, the Court is required to review the challenged LTD benefits decision to determine if it was arbitrary, capricious, or

an abuse of discretion. *Id.*

The question before the Court then, is whether the final decision that Olivera was not totally disabled under the Plan, and therefore not entitled to LTD benefits, was reasoned and supported by substantial evidence. *See Buffonge*, 426 F.3d at 27 (citing *Gannon*, 360 F.3d at 212-213). Substantial evidence is "evidence reasonably sufficient to support a conclusion." *Doyle*, 144 F.3d at 184. Substantial evidence is "more than a scintilla but less than a preponderance." *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir.2000). It is, of course, the hallmark of such review that "a court is not to substitute its judgment for that of the [decision-maker]." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rather, in the ERISA context, it has been stated that under the arbitrary and capricious standard, "a fiduciary's interpretation of a plan will not be disturbed if reasonable." *Terry,* 145 F.3d at 40.

After reviewing the standard for "total disability" under the Plan and the evidence before the plan administrator at the time that it made the final benefits determination, the Court concludes that plan administrator did not abuse its discretion in denying Olivera's claim for long-term disability benefits.  The LTD Plan provides disability benefits for participants who are found to be "totally disabled" under the terms of the Plan.  In its definition for "total disability" the summary plan description provides in relevant part:

> "1.17 'Totally Disabled' or 'Total Disability' means (a) during the first year of a Participant's disability (which shall include six months of total disability pursuant to the Bristol-Meyers Squibb Puerto Rico Inc. Short Term Disability Plan and the first six months of Total Disability pursuant to this plan as well as any period of maternity leave of absence during which the illness or injury is related to pregnancy) that the Participant, as a result of any injury or illness including a nervous, psychoneurotic, mental or personality disorder, is unable to perform the essential functions of his own occupation or any other job that the Company offers him, other than a Temporary Alternative Work Duty assignment, and (b) thereafter, that the Participant is unable to engage in any occupation for which he is qualified by education, training or experience."

(Dkt. 30-4, at p.11 ¶ 1.17). The LTD benefits eligibility decision challenged in the present case concerns only the second definition of "total disability" contained in ¶ 1.17(b), "that the Participant is unable to engage in *any* occupation for which he is qualified by education, training or experience."

Plaintiff argues that the evidence before the plan administrator overwhelmingly

17

supported a decision in favor of Olivera and that Defendant ignored this evidence. Although Plaintiff does not point to specific evidence in the record for which he alleges that Defendant ignored, Plaintiff is presumably referring primarily to the reports of Olivera's treating physicians Dr. Samuel Méndez,[58] Dr. Ivan Martínez,[59] and Dr. Melba Sotomayor,[60] which conclude that Olivera is disabled. It is clear from the record before the Court that the plan administrator's three independent medical consultants Dr. José Ocasio, Dr. Rafael Sein, and Dr. Leonel Shub took into consideration the reports made by Olivera's treating physicians and the other medical documentation that Olivera had submitted to the plan administrator. These independent consultants did not ignore this medical documentation, rather it appears from the record that Dr. Ocasio, Dr. Sein, and Dr. Shub evaluated the documentation but ultimately rejected Plaintiff's treating physicians' conclusion that Olivera is disabled.

This case presents a typical situation of contradictory evidence. Olivera's treating physicians found Olivera to be disabled while Defendant's independent medical consultants concluded that Olivera is not totally disabled. The existence of contradictory evidence does not necessarily defeat a finding of sufficient evidence. *Doyle*, 144 F.3d at 184 (citing *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997)) ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence."); *see also Cortes,* 122 F.Supp.2d at 129. Evidence contrary to a plan administrator's benefits decision does not make the decision unreasonable, provided that substantial evidence supports the decision. *Wright,* 402 F.3d 67 (citing *Gannon*, 360 F.3d at 213; *Doyle*, 144

---

[58] In a letter dated May 4, 2001, Dr. Méndez stated that Olivera had a permanent and incapacitating neurological condition: a lumbo-sacral radiculopathy due to several L4-L5 HMP, and that he has ordered Olivera not to pull, push, lift, or handle objects of more than ten (10) pounds; not to stand or walk for more than twenty (20) minutes at a time, for a cumulative maximum of two (2) hours in an eight (8) hour period; and not to sit for more than twenty (20) minutes at a time and to alternate with breaks in a six (6) hour period. *See* Dkt. Nos. 43-16, 43-17, 43-18.

[59] *See* Dkt. No. 43-19 (Dr. Martínez's physicatric medical report dated October 7, 2002, concluding that Olivera is permanently and totally disabled.)

[60] *See supra* note 8.

F.3d at 184). Here, the plan administrator had ample evidence to support its determination that Olivera was not "totally disabled" within the meaning provided in the Plan.

The evidence in support of the plan administrator's decision to deny Olivera LTD benefits included, but was not necessarily limited to, the following:

1. In an evaluation of Olivera's extensive medical records on May 21, 2002, Dr. Ocasio, an independent occupational medical consultant, concluded that although Olivera was symptomatic and on a conservative treatment program, the medical evidence in his record did not sustain that Olivera had a total disability.

2. On June 7, 2002 Dr. Ocasio evaluated Olivera's medical records and issued a report concluding that although Olivera's LTD benefits had been previously reinstated, Dr. Ocasio did not see enough evidence in the record which would support a total disability.

3. In a report dated July 2, 2002, upon evaluation of Olivera's further updated medical file, Dr. Ocasio concluded that there was not enough evidence to sustain a total disability.

4. In Olivera's August 1, 2002 whole body functional capacity evaluation report, Dr. Rafael Sein, a third-party medical evaluator, found that Olivera's medical records did not justify his restricted performance during the examination. Dr. Sein concluded that Olivera could do more than what he demonstrated during the examination. Dr. Sein also found that during an eight (8) hour workday Olivera could sit for four (4) hours, stand for two (2) to three (3) hours, and walk for four (4) hours. Dr. Sein concluded that Olivera had a functional physical capacity for light duty activities with restrictions on weight-lifting activities.

5. Upon receipt of Olivera's updated medical report and the results of Olivera's August 2002 whole body functional capacity evaluation, Dr. Ocasio issued a report concluding that Olivera was ill but was not totally disabled.

6. In a May 5, 2003 independent medical evaluation performed by Dr. Leonel Shub, a third-party medical evaluator, Dr. Shub found that Olivera's stated disabilities did not correspond with objective medical findings and specifically that all of Olivera's MRIs, bone scans, CT scans, and electro-diagnostic tests were inconsistent with Olivera's stated

disabilities. Dr Shub also found that Olivera's normal shoe wear and tear patterns, lack of hand calluses, the pristine condition of his crutches, lack of any significant muscle atrophy, symmetric reflexes, and abnormal distribution of pain and loss of sensation in a stocking glove distribution were also inconsistent with Olivera's stated disabilities.

There is no indication that the above enumerated medical reports and evaluations failed to provide reasoned support for their conclusions. In response to Defendant's motion for summary judgment, Plaintiff has done nothing more than to point out that the record before the plan administrator contained conflicting medical evidence. This is not sufficient to defeat a finding that the plan administrator relied upon substantial evidence in the record. *See Buffonge*, 426 F.3d at 28 (citing *Leahy v. Raytheon Co.*, 315 F.3d 11, 19 (1st Cir.2002); *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir.2001); *Gannon*, 360 F.3d at 213)) ("[T]he existence of medical evidence pointing in two directions does not render arbitrary or capricious a plan administrator's decision to credit one viewpoint or the other."); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (A plan administrator's denial of benefits was not arbitrary and capricious when its "decision simply came down to a permissible choice between the position of [the plan administrator's] independent medical consultant, and the position of [the claimant's physicians]"); *Elliot v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir.1999) ("It is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented"); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir.1998) (report of medical consultants that plaintiff was not functionally incapacitated provided "ample evidence" to support denial of disability benefits, notwithstanding that the reports conflicted with the opinion of plaintiff's doctors).

The Court's examination of the record reveals that the plan administrator relied upon sufficient and substantial evidence in the record in determining that Olivera was not totally disabled under the second definition of "total disability" contained in the Plan.[61]

---

[61] In his opposition to the motion for summary judgment, as an aside, Olivera rhetorically asks "How can BMS grant the benefits in 2001 and the [sic] deny them in 2003?" (*See* Dkt. No. 44 at p.3.). This question is easily answered. The 2001 LTD benefits determination was made pursuant to the first

Further, the plan administrator's decision to deny Olivera's LTD benefits was rational and reasonably based. As such, the Court is unable to conclude that Defendant acted in an arbitrary or capricious manner or abused its discretion when it denied Olivera LTD benefits. Accordingly, Defendant's final decision denying Olivera LTD benefits cannot be disturbed by this Court.

## CONCLUSION

For the aforementioned reasons, Defendant's motion for summary judgment is **granted**. Judgment dismissing this case shall be entered accordingly.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, April 5, 2006.

S/ HECTOR M. LAFFITTE
United States District Judge

---

definition of "total disability" under the Plan, where a participant is deemed disabled if he cannot perform the functions of his *own* occupation. However, the 2003 benefits determination was made under the Plan's second and more onerous definition which defines "total disability" as the inability to engage in *any* occupation for which the Participant would be qualified by education, training or experience. (*See* Dkt. 30-4, at p.11 ¶ 1.17).